IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON  DIVISION

IN RE: DIGITEK PRODUCTS LIABILITY LITIGATION

MDL NO.  2:08-md-01968

THIS ORDER RELATES TO ALL CASES

PRETRIAL ORDER # 60
(Memorandum Opinion and Order re Motion for Class Certification)

Pending is the motion for class certification filed by class representatives in six different actions within this multidistrict litigation ("MDL") [Dckt. 283].

I.

A.      *A Brief History of the Digitek® Recall*

Digitek® is a trade-name for a drug called digoxin.  Digoxin is approved by the Food and Drug Administration ("FDA") to treat heart problems.  The plaintiffs claim to have taken Digitek® in the past. The defendants are pharmaceutical companies in the drug distribution chain.  The prescribed dose of digoxin is important. The plaintiffs assert that even a small overdose can transform this beneficial drug into a toxic one.   They claim toxicity can result in heart, gastrointestinal, blood pressure, and vision problems among others.

From January 10 through February 8, 2006, and again from July 10 to August 10, 2006, the FDA inspected defendant Actavis Totowa LLC's ("Actavis Totowa") New Jersey production facilities.  The inspections resulted in FDA letter warnings that production and paperwork practices were out of sync with the Federal Food, Drug and Cosmetic Act and its accompanying regulations. The first warning letter mentioned adverse drug events dating back to 1999 for products, including

digoxin, that were not properly reported to the FDA.  The second warning letter cited Actavis Totowa for "significant deviations from the [FDA's] current Good Manufacturing Practice ['cGMP'] regulations."   The cGMP regulations are the mandatory best practices for pharmaceutical manufacturing.  The regulations help guarantee that the drug in the bottle matches what is on the label.

At some point, 20 nonconforming tablets were found in a lot of 4.8 million tablets manufactured in November 2007.  Two inspections revealed no other non-conforming tablets in the lot.  The lot was then released for distribution on January 28, 2008.  Four months later, on April 25, 2008, Actavis Totowa initiated a voluntary Class I nationwide recall.  A "Class I" recall happens when the drug is "dangerous or defective . . . [and] predictably could cause serious adverse health problems or death." The recall covered all strengths of Digitek® tablets -- 692.4 million pills manufactured between April and February 2008.  The FDA announcement about the recall said that

> [t]he product is being recalled due to the possibility that tablets with double the appropriate thickness may contain twice the approved level of active ingredient. The existence of double strength tablets poses a risk of digitalis toxicity . . . . Several reports of illnesses and injuries have been reported. Patients should contact their healthcare professional with questions.

An Actavis Totowa press release tracked the FDA announcement.  The plaintiffs say discovery revealed one non-conforming tablet was found in the market.  Aside from that, no double- thick tablet has been found.

Actavis Totowa is based in New Jersey.  It manufactured, but did not distribute, Digitek®. Defendants UDL Laboratories, Inc. and Mylan Pharmaceuticals distributed Digitek®. Those two defendants, along with Mylan, Inc., Mylan Pharmaceuticals, Inc.and Mylan Bertek Pharmaceuticals, Inc., all reside outside New Jersey and are incorporated elsewhere. (*Id.*)  The plaintiffs essentially allege that all of the defendants are in some way responsible for the recalled Digitek®. They appear

to pin primary responsibility though on the Actavis defendants.

When Mylan and UDL learned of the recall, they hired Stericycle, Inc., to manage it. Stericycle sent a notification packet to wholesalers, pharmacies, hospitals, and others.  The packet instructed the recipients to contact their customers at once. When consumers contacted Stericycle, they were sent a return kit.  The kit was used to return unused Digitek® and pharmacy receipts. Once it received the kit, Stericycle sent a refund.  If receipts were lacking, refunds were given on a per-tablet basis.

A flood of civil actions were instituted in state and federal courts across the country.  The plaintiffs claimed a variety of injuries and losses resulting from the recalled Digitek®.  On August 13, 2008, the Judicial Panel on Multidistrict Litigation established an MDL proceeding in this district.   Since that time, federal Digitek® litigation has been centered here for coordinated management.

B.     *The Class Complaints*

Six class action complaints remain.  I summarize them below.

### 1. Chambers v. Actavis Totowa, LLC

New Jersey native George Palladino originally filed this action in New Jersey.  A Second Amended Class Action Complaint was filed August 28, 2009.  It drops Palladino and names fellow New Jersey resident Alan Chambers as the sole class representative.  The class Mr. Chambers wants to represent involves those New Jersey representatives who were prescribed and took recalled Digitek®.

Mr. Chambers took Digitek® from January 23 to April 30, 2008.  He used it to regulate his heart rhythm.  He claims that while on Digitek® he experienced heart "contractions."  Prior to the recall, his doctor said that symptom was caused by an implanted medical device.  Mr. Chambers also had the same symptom while taking another brand of digoxin. After he found out about the recall at his pharmacy, he did not call his doctor. He waited for someone to call him instead.  He stopped taking digoxin and waited for his next regularly scheduled doctor appointment. When he learned of the recall, Mr. Chambers had already taken all of the Digitek® that he had on hand.  He seeks to recover  $15 in co-payments and the cost of the doctor appointment that was scheduled before the recall.

Count Four of Mr. Chambers' complaint alleges breach of express warranty.[1]  Mr. Chambers accuses the defendants of falsely warranting that the recalled Digitek® was non-defective and not unreasonably dangerous.  He also says they warranted it to be consistent with its label and safe to take. (Sec. Am. Compl. ¶ 108).

Count Five alleges breach of implied warranty.  Mr. Chambers asserts that the defendants

---

[1]There are other counts in the Second Amended Complaint such as (1) Violation of the New Jersey Product Liability Act (Count One); (2) *res ipsa loquitor* (Count Two); and (3) negligence *per se* (Count Three).  Mr. Chambers does not seek a certification order for these claims.  This same pattern appears in the five other cases.   The defendants explain the situation as follows:

> When originally filed, these [six] complaints sought personal injury and medical monitoring in addition to economic damages, and certain ones (*e.g.*, Chambers and York) only requested statewide certifications. As now evolved, however, Plaintiffs uniformly seek nationwide certification and have disavowed all personal injury/medical monitoring class allegations, leaving claims for "economic loss" only, although some Plaintiffs still need to amend their pleadings accordingly.

(Defs. Resp. at 6-7).  In discussing the remaining five complaints, I am only going to mention those claims for which certification is sought.

4

falsely warranted the drug to be merchantable and safe for use.

Count Six alleges a claim under the New Jersey Consumer Fraud Act ("NJCFA").  Mr. Chambers alleges affirmative misrepresentations, and knowing omissions, to the class and others regarding the safety and dosage of digoxin in the recalled Digitek®.  He charges that the defendants acted unfairly, deceptively, and unlawfully.  He also asserts that they engaged in unconscionable acts and practices prohibited by the NJCFA.

Count Seven alleges unjust enrichment.  He asserts that the defendants accepted money for recalled Digitek®.  In return, he says the class members got an unsafe and ineffective drug.

### 2. Campbell v. Actavis

This action was instituted originally by Michael Pasken, Marie Keever, Dale Campbell. They live in Florida, New York, and Pennsylvania respectively.  The case was transferred from the United States District Court for the District of New Jersey. A First Amended complaint was filed. Dale Campbell, a Pennsylvania resident, is now the lone representative plaintiff for a nationwide class.  He took Digitek® from May 2007 to June 2008.  He claims he suffered dizziness, nausea, and palpitations in May 2008 as a result.  He was never told as much by a physician.  He seeks to recover the co-payments he spent to have his Digitek® prescriptions filled.

Count Six of Mr. Campbell's complaint alleges breach of express warranty.  Count Seven alleges a violation of the NJCFA. Count Eight alleges unjust enrichment.

### 3. Wilburn v. Actavis Group hf

This action was instituted originally by Kevin Clark and Willie Mae Wilburn.  They live in Pennsylvania and Illinois respectively.  Like *Chambers*, the case was transferred here from New Jersey.  A Second Amended Individual and Class Action Complaint was filed August 14, 2009.  It

5

names Ms. Wilburn as the sole class representative for a nationwide class.

She took Digitek® daily from 2005 to April 2008 for heart palpitations.  In February or March of 2008, she was diagnosed with an irregular heart rhythm.  She claims weakness, dizziness, a bad memory, fatigue and other problems.  She has never told a doctor that she thought Digitek® hurt her.  She has also never consulted anyone concerning her memory loss.

She learned about the recall from her pharmacy.  She returned her unused pills in exchange for  replacement digoxin.  She did not schedule a special appointment with her doctor after the recall.  She waited instead for her next regular visit. She wants to recover the money she paid for post-recall evaluation and testing, including a May 2008 emergency room visit for shortness of breath.  She also seeks reimbursement for two $5.00 co-payments for Digitek® prescriptions and replacement pills.

Counts Eight and Nine of Ms. Wilburn's complaint respectively allege breaches of express and implied warranty.  Her complaint, like others, alleges that defendants' actions constitute unfair, deceptive, unlawful, and/or unconscionable acts.  She is not just pleading an NJCFA claim though.  She also alleges the defendants violated "Consumer Protection Statutes of the various states." (Sec. Am. Compl. ¶ 200).  Count Fourteen goes so far as to specifically allege violations of the apparently all of the state consumer protection statutes. Count Seven alleges a claim for unjust enrichment.

### 4.  Konek v. Actavis, Inc.

This case was transferred from the United States District Court for the District of Kansas.  The Class Action Complaint was filed May 19, 2008, by Peter J. Konek, who lives in Kansas.  He seeks to represent a nationwide class.  He took Digitek® from November 2007 to April 2008.  Mr. Konek did not visit his physician post-recall.  He simply phoned in and received a replacement prescription the next day.  He seeks $2.21 as reimbursement for the 17 tablets he had left.  He also

wants $20.00 for co-payments he made.  He candidly admits that Digitek® "did its job" for him. His goal is to see that the defendants "get punished."

Counts One and Two of Mr. Konek's complaint allege separate violations of the Kansas Consumer Protection Act ("KCPA").  In Count Two, Mr. Konek specifically alleges that "the proposed nationwide Class members did not receive the material benefit of safe, appropriately-dosed Digitek® heart medication." (Class Action Compl. ¶ 85).  Count Three is an unjust enrichment claim.  Counts Ten and Eleven respectively allege breaches of express and implied warranties.

### 5.  Lange v. Actavis Totowa, LLC

Gary Ervin originally filed this action.  He lives in Florida.  A First Amended Complaint names William E. Lange alone as representative plaintiff for a nationwide class.  Mr. Lange lives in Kentucky.  He began taking Digitek® in 2003.  He continued taking it until the recall.  After receiving a recall letter, he made two trips to his drug store.  The store is less than a mile from his home.  He discussed the recall with the pharmacist.  He was given replacement digoxin.  After that, he made an appointment with his cardiologist to discuss the recall.  He received no diagnostic testing.  He says he did not know about the Stericycle refund program.  The program would have compensated him for the 35 to 36 remaining Digitek® pills he had left.  He wants fuel costs for the two trips to his drug store.  He also seeks the $10 co-payment for a prescription and the cost of the doctor appointment.

Counts One and Two of the complaint allege breaches of implied and express warranties. Count Seven alleges "VIOLATION OF CONSUMER FRAUD AND UNFAIR TRADE PRACTICES STATUTES."  (First Am. Compl. at 28).  Paragraph 118 of the pleading says this:

7

> *Every State* has enacted statutes to protect consumers from deceptive, fraudulent, and
> unconscionable trade and business practices. Defendants violated these statutes by
> knowing and falsely representing that Digitek® (Digoxin) was fit to be used for the
> purpose for which it was intended, when Defendants knew it was defective,
> dangerous, ineffective, unsafe and by other acts alleged herein.

(*Id.* (emphasis added)).  He specifically alleges unfair competition and unfair or deceptive act claims under each and every state consumer protection statute. Count Eight alleges a claim for unjust enrichment.  It specifically alleges that he and his fellow "Class Members were not receiving a product of the quality, nature or fitness that had been represented by Defendants, or that Plaintiff and Class Members, as reasonable consumers, expected." (*Id.*)

### 6. York v. Actavis Totowa, LLC

Seven representatives started this action.  Two remain: Judy A. Whitaker, as Executrix of the Estate of Anna Fight, both from Kentucky and Lorena Ard, who lives in Indiana. The case was transferred from the United States District Court for Western District of Kentucky.

Ms. Whitaker's mother, Ms. Fight, had two strokes.  She passed away in May 2007.  Almost a year later, Ms. Whitaker learned that Digitek® had been recalled.  She now now believes that the recalled Digitek®, or some other brand of digoxin, caused her mother's nausea, weight loss, fatigue, strokes and, ultimately, her death.  No medical professional has told her as much.  She believes Digitek® and digoxin are the same substance.  She used the terms interchangeably throughout her deposition.

Ms. Whitaker alleges a wrongful death claim in her class complaint.  She intends to pursue the claim although the class seeks much narrower relief.  She also admits that she did not personally suffer any economic loss by virtue of the recall.  The economic damages for which she seeks recovery are for the symptoms experienced, and treatment received, by her mother.  These include

hospitalizations, testing, and all travel and out-of-pocket costs associated with treatment. When she passed away, Ms. Fight had Digitek® pills in her possession. They remained unused for reasons unrelated to the recall.

Ms. Ard is a nurse. She began taking Digitek® in 2006. She took it from October or November 2007 until May 2008. She says Digitek® caused her to experience fatigue, shortness of breath, and an irregular heartbeat. In mid-February 2008, she contacted her cardiologist about an irregular heartbeat. At the appointment, she did not discuss Digitek®. She underwent no other diagnostic testing. She eventually had a cardiac catheterization. While in the hospital she was taken off Digitek® and placed on Lanoxin. She claims her symptoms disappeared while on that drug. She says they returned after starting Digitek® again. She stopped taking Digitek® after the recall.

Ms. Ard seeks lost wages for 120 hours of sick leave at $42 per hour, a $20.00 co-payment for a doctor's visit, and any other uninsured hospital admissions costs. She also wants emotional distress damages for herself and the class. She has 117 unused Digitek® tablets. She denies knowing anything about the Stericycle refund program.

Counts Four and Five of her complaint allege breaches of express and implied warranties. Count Six is a claim under the Kentucky Consumer Protection Act. Count Seven is an unjust enrichment claim.

## C.    *The Request for Class Certification*

The representatives mentioned above want an economic loss class certified pursuant to *Federal Rule of Civil Procedure* 23. Two of the class complaints seek only a single-state class. The motion for class certification is much broader. The motion requests that I certify a nationwide class of:

All persons residing in the United States who purchased Digitek® pursuant to prescription, during the time period when the Recalled Digitek® was manufactured, produced, distributed, sold or otherwise supplied, who suffered economic losses, including, but not limited to, payments for Recalled Digitek®, out-of-pocket expenses for diagnostic testing, medical testing, medical visits, and/or new prescriptions, as a result of having received Recalled Digitek®. . . .

(Pls.' Memo. in Supp. at 37). If I decline to certify a nationwide class, the plaintiffs are willing to settle for individual state classes.

The motion focuses not on the distinct and highly individualized injuries, if any, to the class. They emphasize instead the defendants' alleged misconduct that led to the recall, particularly that of Actavis Totowa, which is based in New Jersey. In doing so, the plaintiffs try to paint New Jersey as the nerve center for certification purposes. In fact, they say New Jersey law should control all of the potentially hundreds of thousands of class members' claims and recoveries throughout the United States. They downplay the individual issues that will arise. They stress instead that the damages suffered by each individual class member are modest and, absent a certified class, millions of consumers will be left without remedy.

## II.

There are several steps in the certification analysis. An overview is helpful. First, in order to conduct the Rule 23 analysis and decide if I should certify the class, I have to know what state's or states' laws apply. As will be seen below, the choice-of law rules for some of the transferor courts are set by the *Restatement (Second) of Conflict of Laws* ("*Restatement*"). The *Restatement* analysis, and some other conflict rules as well, has two steps. Step one involves analyzing if an "actual conflict exists between the laws of the various states by examining the substance of the potentially applicable laws." *See*, *e.g.*, *In re NorVergence, Inc.*, 424 B.R. 663, 698

10

(Bkrtcy. D.N.J. 2010) (citing, in part, *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46, 55 (D. N.J. 2009)).  If no conflict exists, then I can just apply a single set of laws to the entire class' claims.

The "potentially applicable laws here" at step one though are far greater than the usual two-state choice in a simple tort action -- if there are, as the parties suggest, injured folks in all 50 states, then all 50 state laws need to be evaluated at step one to determine if there are actual conflicts.  If there are conflicts, I move to step two.  Step two takes me back to the conflict-of-law rules for the four transferor states -- New Jersey, Kansas, Kentucky, and West Virginia.  This seems like a confusing step backward.  It is not.  Using those four states' rules, I go beyond step one.  In other words, I am no longer analyzing what state's or states' laws apply *potentially*, but instead what law or laws apply in *actuality*.  Once I know that, I can then analyze the certification request under Rule 23.

In the remainder of this opinion, I first discuss choice-of-law principles generally in Section II.A.  Next, I perform the two-step choice-of-law analysis in Sections II.B and II.C.  Using, in part, the fruits of the choice-of-law analysis, I end up in Sections II.E and II.F with the certification determination under Rule 23.

A.      *Choice of Law Issues in the Rule 23(b)(3) Context*

Choice-of-law issues were treated "superficially" in early class-certification opinions involving state-law claims.  *See* 7AA Charles A. Wright *et al*., *Federal Practice and Procedure* § 1780.1 (3d. ed elec. 2010).  The Supreme Court changed that approach in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985):

11

Here the Supreme Court of Kansas took the view that in a nationwide class action where procedural due process guarantees of notice and adequate representation were met, "the law of the forum should be applied unless compelling reasons exist for applying a different law." Whatever practical reasons may have commended this rule to the Supreme Court of Kansas, for the [constitutional] reasons already stated we do not believe that it is consistent with the decisions of this Court.

*Id.* at 822-23 (some citations omitted). This more serious approach to choice-of-law issues in the Rule 23(b)(3) context has continued in subsequent decisions. *See*, *e.g.*, *Amchem Products, Inc. v Windsor*, 521 U.S. 591, 624 (1997) (noting that individual disparities among claimants were compounded by "[d]ifferences in state law . . . .") (citing *Shutts*, 472 U.S. at 823).

One noted commentator analyzes the dramatic shift in the law following *Shutts*:

Because purported nationwide product liability class actions usually will potentially implicate the common law of, *inter alia*, negligence, strict liability and breach of warranty, as well as state consumer protection and other statutes, of 50 states, the court ordinarily will have to conduct a choice of law analysis. . . . [W]hen class certification is sought in a case based on state law claims, *the question of which law governs is crucial in making a class certification determination. Indeed, most recent motions for certification of nationwide classes have in significant part turned on whether the court can apply a single state's law to the claims of a nationwide class, or must apply the laws of all 50 states*.

1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:46 (6th ed. elec. 2009) (emphasis added); *see also* 7AA Charles A. Wright *et al.*, § 1780.1 ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states . . . . The application of multiple state laws to the action works to defeat predominance because the legal issues no longer pose a common question.") (footnotes omitted).

The choice-of-law analysis can be a complex matter for the moving representatives. The principal commentators on the *Federal Rules of Civil Procedure*, citing *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), put it this way :

> [T]he district court is required to determine which law will apply before making a predominance determination and plaintiff has the burden to show that variations in state law do not defeat predominance. *Indeed, the court suggested that the plaintiff's burden includes providing the district court with a survey critically analyzing the differences in each state's laws and discussing how the court could deal with those variations*.

7AA Charles A. Wright *et al.*, § 1780.1 (emphasis added).   These same commentators note that "many courts require plaintiff to accompany a motion for class certification with a survey of the variations in each state's laws, as well as a plan for subclassing the different variations. Only if that burden is met will Rule 23(b)(3) be deemed satisfied." *Id.* (footnotes omitted).   Our court of appeals essentially imposed this same obligation in *Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) ("The plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various laws have not been identified and compared." *Id.*; *see also In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 455 n.7 (E. D. La. 2006).[2]

The parties agree on a few issues.   First, they are correct that I apply the choice-of-law rules that would be used by the transferors.   *Smith v. Waste Management, Inc.*, 407 F.3d 381, 384 (5th Cir. 2005) ("'Where a transferee court presides over [a] diversity action [ ] . . . under the multidistrict rules,' the governing law comes from the 'jurisdiction in which the transferred' case originated.") (quoting *In re Air Disaster*, 81 F.3d 570, 576 (5th Cir. 1996)); *In re Vioxx*, 239 F.R.D. at 454 (E.D. La. 2006); 19 Charles A. Wright *et al.*, § 4506 n. 45.   Second, they agree that the transferors for the six class complaints under consideration are New Jersey (3), Kentucky, Kansas, and West Virginia.

Again, while some of the complaints may contemplate additional theories of liability, the certification request is much narrower.   I need only analyze for Rule 23 purposes the following

---

[2]Plaintiffs' choice-of-law and case management analysis paints with too broad a brush.   As I said, they focus too heavily on the defendants' wrongdoing and practically ignore the choice-of-law impact of the location where the class members were harmed.

claims: (1) statutory consumer fraud, (2) breach of implied warranty, (3) breach of express warranty, and (4) unjust enrichment.

B.      *Conflicts Between the Applicable State Laws*

Moving to the first step in a choice-of-law analysis, I am looking to see if there is an actual conflict or no conflict at all in the *potentially* applicable state laws.  As I said, all 50 states' laws *potentially* apply here.  Some of the class complaints actually allege statutory consumer fraud violations under the consumer protections statutes of all 50 states.  The plaintiffs also admit that "potential class members number in the thousands . . . [and] Digitek was sold nationwide, so the class contains members from across the nation."  (Pls.' Mem. in Supp. at 39).

Looking first to the statutory consumer fraud and unjust enrichment claims, numerous courts have found conflicts across the nation. Just a few months ago one court, quoting another, said this:

> "Numerous courts, including the Seventh Circuit, have dealt with this question. Overwhelmingly, those courts have found material conflicts among the fifty states' laws on the claims plaintiffs bring in this case and have denied class certification, at least in part, on that basis. *E.g., Bridgestone/Firestone*, 288 F.3d at 1015 (applying Indiana law, but noting "state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products liability suits may not proceed as nationwide class action"); *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 532-33 (N.D.Ill.2008) (finding that differences in state law on unjust enrichment precluded certification of nationwide class; citing numerous other cases stating the same); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 583-85 (N.D.Ill.2008) (denying class certification under FCRP 23(a)(2) and (b)(3), because plaintiffs failed to establish commonality, superiority and predominance due to multi-state law conflicts; describing the material differences in state laws on unjust enrichment and consumer protection; citing numerous other cases stating the same)."

*Pilgrim v. Universal Health Card, LLC*, No. 5:09CV879, --- F. Supp.2d ---, ---, 2010 WL 1254849, at *4 (N.D. Oh. 2010) (quoting *In re McDonald's French Fries Litigation*, 257 F.R.D. 669, 673-74 (N.D. Ill.2009)); *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir.2002) ("State consumer-protection laws vary considerably, and courts must respect these differences rather

14

than apply one state's law to sales in other states with different rules.") (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568-73 (1996)); *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (adopting the rule in *In re Bridgestone/Firestone*); *Tyler v. Alltel Corp.*, 265 F.R.D. 415, 422 (E.D. Ark. 2010) (discussing at length, and citing multiple authorities for, the proposition that unjust enrichment law varies considerably throughout the United States); Allan Kanner, *Consumer Class Actions After CAFA*, 56 Drake L. Rev. 303, 334 (2008); 17 Am. Jur. 2d *Consumer Protection* § 255 ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules.").

I reach the same conclusion with the express and implied warranty claims.[3] *See*, *e.g.*, *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016-17 (D.C. Cir.1986) ("They say no variations in state warranty laws relevant to this case exist. A court cannot accept such an assertion 'on faith.' Appellees, as class action proponents, must show that it is accurate. We have made no inquiry of our own on this score and, for the current purpose, simply note the general unstartling statement made in a leading treatise: 'The Uniform Commercial Code is not uniform.'") (Ruth Bader Ginsburg, J.) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* 7 (2nd ed. 1980); *In re General Motors Corp. Dex-Cool Products Liability Litigation*, 241 F.R.D. 305, 319 (S.D. Ill. 2007)

-----

[3]Incidentally, while the parties do not stress it, I believe the version of the *Uniform Commercial Code* ("*UCC*") in each state controls the warranty claims. *See*, *e.g.*, *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 89 (4th Cir. 1989) ("The South Carolina Commercial Code governs sales of chattels such as airplanes and allows recovery by users and consumers who are personally injured by breach of warranty. Since a claim for breach of warranty arises under the Code, not general tort liability, the traditional *lex loci delicti* rule does not apply. Rather, the Code contains a specific conflict of laws rule . . . .") (citation omitted); 1 Barkley Clark & Christopher Smith, *The Law of Product Warranties* § 1:4 (Elec. ed. 2009)  ("The . . . [*UCC*] covers all sales of goods, from a $10 million generator sold to a huge public utility to a $3 pocket flashlight bought by a consumer.").

(offering an exhaustively researched analysis "suggest[ing] that the states in the proposed class employ at least three distinct approaches to the question of reliance as an element of a claim for breach of an express warranty."); *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 673 (Tex. 2004); Erika E. Schinler, *Trouble at the Sausage Factory: Has the Uniform Computer Information Transactions Act Been Unjustly Stigmatized?*, 75 Tul. L. Rev. 507, 516 (2000) (explaining that, while "the U.C.C. provides a nearly uniform backbone, consumer product warranty law is not uniform; judicial interpretations of the U.C.C. vary, and each state's statutory scheme reflects differing needs and policies"); *see also UCC Local Code Variations* §§ 2-313, 2-314.

So, at step one, it is apparent that the laws of the 50 states conflict on the four claims for which certification is sought.   The remaining question at step two is whether these *potentially* conflicting state  laws are in *actuality* the state laws that do apply to the class claims based upon the choice-of-law rules used in New Jersey, Kansas, Kentucky, and West Virginia.  In doing so, I have to analyze, on a claim-by-claim basis, what particular choice-of-law rule applies in each state to the statutory consumer fraud, unjust enrichment, and express and implied warranty claims.


*C.*     *The Choice-of-Law Tests Applicable in New Jersey, Kansas, Kentucky, and West Virginia*

As will be seen, the four states' versions of the *UCC* each contain their own specific choice-of-law provision.  If no specific rule is applied to the statutory consumer fraud or unjust enrichment claims in any of the states, I will apply that state's general tort choice-of-law rule to the statutory consumer fraud claim and its general contract counterpart to the quasi-contract, unjust enrichment claim.

16

### 1. New Jersey

The choice-of-law analysis for New Jersey is essentially the same for both contract and tort claims.  *See Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 461 (D.N.J. 2009) ("Since the New Jersey Supreme Court has abandoned the flexible governmental interests analysis in favor of the most significant relationship test in the context of tort choice of law issues, the Court will apply this test to Plaintiffs' tort claims as well as to their breach of contract claim."); *see also P.V. v. Camp Jaycee*, 962 A.2d 453, 461 (2008) (adopting the "most significant relationship" test created by the *Restatement*).  The *Restatement* test requires analysis of many factors.  For the statutory consumer fraud NJCFA claim found in *Chambers*, *Campbell*, and *Wilburn*, which sounds in tort, a number of factors from three different *Restatement* sections apply.  *See In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46, 65, 68 (D.N.J. 2009)  ("Section 148 of the Restatement governs choice of law analysis for consumer fraud claims. . . . . Even if the claim-specific factors articulated in . . . [*Restatement*] § 148(2) did weigh in favor of applying the law of each class member's home state, that finding would not conclude the Court's choice of law analysis.  Rather, the claim-specific considerations contained in Restatement § 148(2) must be balanced against those enumerated in section 6."); *Camp Jaycee*, 962 A.2d at 460 (court "Viewed through the section 6 prism, the state with the strongest section 145 contacts will have the most significant relationship to the parties or issues, and thus its law will be applied.").  Here is a summary:

| *Section 148(2) Factors* | *Section 145(2) Factors* | *Section 6 Factors*[4] |
|---|---|---|
| (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, | (a) the place where the injury occurred, | (a) the interests of interstate comity; |
| (b) the place where the plaintiff received the representations, | (b) the place where the conduct causing the injury occurred, | (b) the interests of the parties; |
| (c) the place where the defendant made the representations, | (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and | (c) the interests underlying the field of tort law; |
| (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, | (d) the place where the relationship, if any, between the parties is centered. | (d) the interests of judicial administration; and |
| (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and | | (e) the competing interests of the states." |
| (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant. | | |

In the first column, factor (d) is neutral. Factor (c) leans toward use of New Jersey law based upon the location where the recalled Digitek® was manufactured.[5] The remaining factors in the first column, weigh against New Jersey law and implicate the laws of all 50 states given where the class members reside.   In the second column, both factors (a) and (d) lead to the same result. To the extent any doubt remains, the third column settles the matter.  All of the third-column factors reduce to one inescapable conclusion: The state in which each claimant was injured has an overriding interest in having its laws applied to redress any wrong done.[6]

---

[4]I recognize section 6 actually lists more factors.  I use these based upon the conclusion in *Camp Jaycee* that this shorter recitation is the section 6 principles "[r]educed to their essence . . . ."  *Camp Jaycee*, 962 A.2d at 463.

[5]At the same time, that analysis is oversimplified a bit.  Plaintiffs lay blame on all of the defendants.  Some are not New Jersey residents.

[6]The plaintiffs contend that "looking to the place of a particular class member's residence as the most significant point of contact in this case for choice of law purposes ignores the reality (continued...)

The applicable factors for the unjust enrichment claim include the section 6 factors.  Also relevant are the section 221(2) factors governing restitution: (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship, (2) the place where the benefit or enrichment was received, (3) the place where the act conferring the benefit or enrichment was done, (4) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (5) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.  The section 221(2) factors make for murky waters.  Like the NJCFA claim, however, the water clears when the section 6 factors are considered.  The laws of all 50 states apply to the unjust enrichment claim.

Turning to analysis of the warranty claims, the applicable New Jersey *UCC* section provides pertinently as follows:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties.  *Failing such agreement this act applies to transactions bearing an appropriate relation to this State*.

N.J. Stat. Ann. § 12A:1-105(1).  The transactions at issue here relate only minimally to New Jersey.  Since compensation is sought for class harm, I have to consider strongly the place where that harm occurred.  It took place in the home states of the class members.  *See* 2 David G. Owen *et al.*, *Madden & Owen on Product Liability* § 30:10 (3d ed. 2010) ("The Code's adoption of an

_____

[6](...continued)
that all of the wrongdoing took place in New Jersey."  (Pls.' Reply at 23).  To ignore the place of injury, a vital consideration to both the injured party and the state within which he or she lives, would set aside decades of precedent on the proper application of choice-of-law principles.

'appropriate' relationship standard for determining whether forum law applies in warranty conflicts does not mean that courts will be unwilling to make some other choice, such as for example the place of the injury where the interests of that state in the issues raised in the action are significant."); *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85 (4th Cir. 1989) (interpreting *UCC* conflict-of-law provision and stating "[I]n *In re Merritt Dredging Co., Inc.*, 839 F.2d 203 (4th Cir.1988), we used the 'most significant relationship' test as a method to determine whether there was an 'appropriate relationship' to South Carolina. Here, since plaintiff's decedent was a resident of South Carolina, he purchased the airplane in South Carolina, he acquired the protections of the warranty in South Carolina, and he permanently stored and maintained the airplane in South Carolina, the breach of warranty claim bears an appropriate relationship to South Carolina.") (citations omitted); *see also Arons v. Rite Aid Corp.*, No. BER-L-4641-03, 2005 WL 975462, at *22 (N.J. Super. Law Div. Mar. 23, 2005) (unpub.) ( citing section 12A-1-105 and stating "The locus of the transaction -- from where . . . the breach of warranty is felt -- is the jurisdiction that has the greatest governmental interest in having its breach of contract/warranty laws applied.. . . Therefore, many different state laws shall apply in this case if they are unlike New Jersey's because the court shall necessarily apply the law of each of the jurisdictions from which potential absent class members acquired their tablets of putative Lipitor.").  So multiple states' laws govern the claims of those class members represented by New Jersey filers Chambers, Campbell, and Wilburn.  Accordingly, the choice-of-law analysis for New Jersey points in all directions, encompassing the law of the entire United States.

### 2. Kansas

In Kansas, Mr. Konek's statutory consumer fraud claim is subject to the "place of the wrong," or *lex loci delicti*, test. *See Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985) ; *see also*

*Dragon v. Vanguard Industries, Inc.*, 89 P.3d 908, 914-15 (Kan. 2004).[7]  The Kansas' Unfair Trade and Consumer Protection Act does not appear to contemplate claims by those injured beyond the state's borders.   Kan. Stat. Ann. § 50-638 ("Any supplier . . . [who] engages in a consumer transaction *in this state*, thereby submits the supplier to the jurisdiction of the courts of this state as to any cause of action arising from such consumer transaction.") (emphasis added).  I decline to expand beyond this line drawn by the Kansas Legislature.   That means I cannot apply Kansas law alone to the statutory consumer fraud claim.  The laws of all 50 states would apply.

The Kansas choice-of-law rule for unjust enrichment is muddled.  If I treat the claim as sounding essentially in contract, as some courts have done, Kansas applies "the rule of *lex loci contractus* (the place where the contract was made) . . . ." *Thompson v. Jiffy Lube Intern., Inc.*, 250 F.R.D. 607, 627 (D. Kan. 2008); *Cummings v. LTC, Inc.*, 1993 WL 119668, at *5 (D. Kan.1993) (citing *Simms v. Metropolitan Life Ins. Co.*, 685 P.2d 321 (1984).  While some conceptual sleight-of-hand is necessary, the contract of sale for each class member was complete when they exchanged their funds for Digitek® at their local drug stores all over the country.

---

[7]Mr. Konek alleges within his statutory consumer fraud claim that defendants made certain misrepresentations to the class. (Class Act. Compl. ¶ 73, 76).  That allegation is significant, at least by analogy, for Kansas choice-of-law purposes:

> "In a misrepresentation or fraudulent omission claim, the 'last event' is the injury; the 'place of the wrong,' therefore, is where the loss is sustained, not where the fraud or misrepresentations were made." *Steele v. Ellis*, 961 F.Supp. 1458, 1463 (D.Kan.1997) (citations omitted). Thus, the governing law comes from the state where the plaintiff felt the effects of the fraud. *Maberry v. Said*, 911 F.Supp. 1393, 1399 (D.Kan.1995); *see Thomas v. Talbott Recovery Systems, Inc.*, 982 F.Supp. 794, 798-99 (D.Kan.1997) ("Because plaintiff alleges financial injury in this case, he felt the wrong in Kansas, where he is a resident."); *Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1286 n. 2 (D.Kan.1997) (similar statement).

*Koch v. Koch Industries, Inc.*, 996 F. Supp. 1273, 1281 (D. Kan. 1998)

The same result is reached with the express and implied warranty claims.  Kansas' version of the *UCC* provides as follows:

> (a) Except as otherwise provided in this section, when a transaction bears reasonable relation to this state and also to another state or nation the parties *may agree* that the law either of this state or of such other state or nation shall govern their rights and duties.
>
> (b) *In the absence of an agreement effective under subsection (a), and except as provided in subsection (c), the uniform commercial code applies to transactions bearing an appropriate relation to this state.*

Kan. Stat. Ann. § 84-1-301(a) and (b) (emphasis added).  The "appropriate relation" test in Kansas here results in the same outcome as I reached under the New Jersey version of the *UCC*.  Accordingly, the choice-of-law analysis for Kansas on all four claims, like New Jersey, points in all directions.

### 3. Kentucky

The Kentucky Supreme Court recently summarized the differing choice-of-law rules applicable to contract and tort actions.  *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  In a nutshell, the state applies the section 188 *Restatement* analysis to contract disputes. This "most significant relationship" test depends heavily upon the section 6 *Restatement* factors analyzed for New Jersey.  *Id.* at 181.  In contrast, the "any significant contacts" test applies to tort actions. *See id.*;  *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky.1972) (holding that in tort cases, "significant contacts -- not necessarily the most significant contacts" permit the application of Kentucky law); *Bonnlander v. Leader Nat. Ins. Co.*, 949 S.W.2d 618, 620 (Ky. App. 1996) (explaining that in tort actions, "any significant contact with Kentucky [i]s sufficient to allow Kentucky law to be applied," whereas in contract actions, "the law of the state with the greatest interest in the outcome of the

22

litigation should be applied").  Kentucky prefers to apply its own law.  It will not do that if the Commonwealth is connected only marginally to the dispute.  *See*, *e.g.*, *Custom Products, Inc. v. Fluor Daniel Canada, Inc.,* 262 F. Supp.2d 767, 771 (W.D. Ky. 2003) (citation omitted) ("First, as a starting presumption, there is 'no doubt Kentucky prefers the application of its own laws over those of another forum.'  Second, although this principle should generally dictate the outcome, there are occasions when a careful examination of the facts reveals that the case's actual connection to Kentucky is simply too remote to justify applying Kentucky law.").[8]

For those class members who purchased or took Digitek® in Kentucky, Kentucky law probably applies regardless of which of the four claims are at issue.  Once that critical geographic contact disappears, however, the Commonwealth's interest in applying its own law becomes marginal at best.  For example, it seems unimaginable that Kentucky law, or New Jersey law for that matter, would apply to a class member residing in, and economically harmed by, Digitek® purchased and used exclusively in California.  With this principle in mind, I think a Kentucky choice-of-law analysis results in the same result reached under the New Jersey most significant relationship analysis.  This is so whether one uses the most significant relationship test applicable

_____

[8]I also apply the general contract choice-of-law rule to the warranty claims based upon the following provision found in Kentucky's version of the *UCC*:

> (2) Except as otherwise provided in this section, when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law of either this state or such other state or nation shall govern their rights and duties.

> (3) In the absence of an agreement effective under subsection (2) of this section, the rights and obligations of the parties are determined by the law *that would be selected by application of this state's conflict-of-laws principles*.

Ky. Rev. Stat. Ann. § 355.1-301(2), (3) (emphasis added).

to Kentucky contracts or the more lenient significant contact analysis applicable to tort claims pled in Kentucky.

So, once again, the choice-of-law analysis for Kentucky, like that of New Jersey and Kansas, points to the four corners of the United States.

### 4. West Virginia

Based upon a prior decision in a somewhat related context, I will apply the *Restatement* analysis to the West Virginia statutory consumer fraud action. *Cf. Pen Coal Corp. v. William H. McGee and Co., Inc.*, 903 F. Supp. 980, 983 (S.D. W. Va. 1995) (noting the hybrid nature of Unfair Trade Practices Act claims but observing that "for the purpose of choice-of-law analysis . . . bad faith and unfair trade practices claims properly should be characterized as contract, not tort, claims.").[9]  I will apply that same test to the quasi-contract unjust enrichment claim.  Defendants asserts that I should apply a contract choice-of-law analysis to the warranty claims pursuant to *City of Bluefield v. Autotrol Corp.*, 723 F. Supp. 362 (S.D. W. Va. 1989).  In *Autotrol*, a contract for services was in dispute.  In this case, the root of the parties' dispute is, once again, a sale of goods, specifically pharmaceuticals.  I will thus use the choice-of-law provision found in West Virginia's version of the *UCC*, which, like New Jersey and Kansas, uses the "appropriate relation" test.  *See* W. Va. Code § 46-1-301(a), (b).

With those familiar standards in place, it is evident that the West Virginia choice-of-law analysis will result in the same outcome reached with respect to New Jersey, Kansas, and Kentucky. That common result is as the defendants forecast at the outset: assuming class members suffered

---

[9]I am aware of the insurance context involved in *Pen Coal*.  I would not reach a different conclusion on the choice-of-law issues, however, even if I applied the more traditional *lex loci* approach to tort claims found in some West Virginia choice-of-law decisions.

economic injuries in all 50 states, the *potentially* applicable substantive laws of all 50 states will, *in actuality,* be necessary to ascertain the appropriate remedy, if any, to be awarded in these cases.

D.    *Standards Governing Certification*

Rule 23(a) sets forth the four threshold factors for coordinated treatment, requiring that a class be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   If the movant satisfies Rule 23(a), subdivision (b) imposes additional requirements, stating that:

> A class action may be maintained *if Rule 23(a) is satisfied and if* . . .
>          . . . .
>
> > (3) the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).   Subdivision (3) provides four nonexclusive factors for analyzing predomination and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

In *Rhodes v. E.I. du Pont de Nemours and Co.*, 253 F.R.D. 365, 372 (S.D. W. Va. 2008), I discussed additional parameters set by our court of appeals for class certification:

> In analyzing class certification claims under the federal rule, the Fourth Circuit encourages federal courts to "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Gunnells v. Healthplan Svcs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989), *abrogated on other grounds by Amchem*, 521 U.S. at 617-18, 117 S. Ct. 2231). Thus, a court has "wide discretion in deciding whether or not to certify a proposed class." *Cent. Wesleyan College v. W.R. Grace Co.*, 6 F.3d 177, 185 (4th Cir.1993) (quoting *In re A.H. Robins Co.*, 880 F.2d at 728-29). Nevertheless, the court must still engage in "rigorous analysis" to determine whether the proposed class meets the Rule 23 requirements. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A court may "probe behind the pleadings" to determine whether class certification is appropriate. Id. "The likelihood of the plaintiffs' success on the merits, however, is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

*Id.* at 372. A final, critical part of the analysis is that "plaintiffs bear the burden of persuading the court that a class should be certified." *Id.* (quoting *Thorn*, 445 F.3d at 321 ("[It] is the plaintiff who bears the burden of showing that the class does comply with Rule 23.") (citing *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 n. 6 (4th Cir. 1977)).

E.       *Analysis of the Rule 23(a) Factors*

### 1. Numerosity

I agree with the parties that the proposed class satisfies the numerosity requirement.  The

class is so numerous that the joinder of all members would be impractical.

## 2. Commonality

Our court of appeals has held that "[i]n a class action brought under Rule 23(b)(3), the 'commonality' requirement [of Rule 23(a)(2)] is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Lienhart v. Dryvit Syst., Inc.*, 255 F.3d 138, 147 n. 4 (4th Cir. 2001) (citing *Amchem*, 521 U.S. at 609).  I followed that approach in *In re Serzone Products Liability Litigation*, 231 F.R.D. 221 (S.D. W. Va. 2005).  I will do the same here and leave this factor for discussion later.

## 3. Typicality

I next examine if the claims of the representatives are typical of the rank-and-file potential class members.  This third factor is pretty important.  Rule 23 is an exception to the usual rule in our nation's court system that "allows named parties to represent absent class members when, *inter alia*, the representative parties' claims are *typical of the claims of every class member*." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (emphasis added) ("To be given the trust responsibility imposed by Rule 23, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'") (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)(internal quotation marks omitted).  The decision in *Dieter* elaborated further:

> That is, "the named plaintiff's claim and the class claims [must be] *so interrelated* that the interests of the class members will be fairly and adequately protected in their absence." The essence of the typicality requirement is captured by the notion that "as goes the claim of the named plaintiff, so go the claims of the class."
>
> The typicality requirement goes to the heart of a representative parties' ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements. The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the

27

absent class members. For that essential reason, plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim. That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned. But when the variation in claims strikes at the heart of the respective causes of actions, we have readily denied class certification. In the language of the Rule, therefore, the representative party may proceed to represent the class only if the plaintiff establishes that his claims or defenses are "typical of the claims or defenses of the class."

*Id.* at 466-67 (citations omitted).

Differences are bound to arise between the representatives and the class. There are even

differences between the representatives themselves. That is worrisome at this early point:

[R]epresentatives (if any) who have economic-loss claims would not prove Judy Whitaker's case even if they prevailed, because she is bringing a wrongful death action. And representatives like Peter Konek or Alan Chambers could not advance anyone's breach-of-warranty or unjust enrichment claims, because they both admitted that Digitek® did just what they had hoped it would do. Similarly, Lange's desire to recover gas money, Milligan's desire to be reimbursed for new glasses, and Pasken's hope for compensation for trip insurance illustrate the wide array of "economic" claims the putative class would expect to assert. There simply is no "typical" claim.

(Defs.' Resp. at 21).[10] The plaintiffs point out that these defense observations overstate things a bit.

At the same time, they illustrate generally the vast gulf that will materialize between the claims of

the class members and those purporting to represent them. This difference requires a cautious

approach, especially given the significant manageability concerns discussed further in.

The real problem with typicality emerges when I factor in the choice-of-law analysis. At

least in the nationwide certification setting, the representatives will pursue their claims using the

---

[10]Plaintiffs note that neither Milligan nor Pasken ever moved to be appointed as class representatives. The nature of their claims is still worth comparing to the representatives though. If nothing else, the comparison forecasts future differences between the representatives and the class they purport to represent.

laws that apply in their states.  Some of the class members will live in those same states.  Many more will not.  So the claims pursued by the representatives will face benefits and obstacles not present in the home states of the class members they represent.  A number of courts have found that weighs against finding typicality.  *See, e.g., In re Panacryl Sutures Products Liability Cases*, 263 F.R.D. 312, 322 (E.D.N.C. 2009) ("[B]ecause Plaintiffs have not shown that the prospective class representatives' claims will take into account the substantive laws governing every class member, this Court's conclusion that the laws of the prospective class members' home jurisdictions will govern their claims precludes a finding of typicality."); *In re Vioxx*, 239 F.R.D. at 460; *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir.2002); *In re Telectronics Pacing Systems*, 172 F.R.D. 271, 281 (S.D. Ohio 1997).

So whether I consider factual differences in the statewide class setting, or legal differences in the nationwide class setting, the typicality requirement is not satisfied.

### 4.  Adequacy

The defendants raise real and detailed misgivings concerning the representatives suitability.  I share those concerns.  I am willing to assume this factor is satisfied without extensive analysis though.  As will become clear, plaintiffs cannot satisfy Rule 23(b)(3).

F.     *Analysis of the Rule 23(b)(3) Factors*

### 1.  Predomination

The predomination analysis centers on whether the questions of law or fact common to class members predominate over any questions affecting only individual members.  Plaintiffs identify 18

different proposed common questions of law and fact.[11]  Some of those issues seem to satisfy the commonality requirement.  Other proposed common questions though are either drawn too broadly or, at worst, are not issues at all, common or otherwise.  A few common issues identified by the plaintiffs illustrate the point:

> a.    Whether Defendants' [sic] violated the New Jersey Consumer Fraud Act ("NJCFA");
>
> b.    Whether the Recalled Digitek® was and is unsafe for use in humans;
> . . . .
>
> e.    How Defendants acted in designing, developing, manufacturing, labeling, packaging, inspecting, dosing, supplying, distributing and selling the Recalled Digitek®; [and]
>
> f.    Whether Defendants conducted, either directly or indirectly, adequate dose testing, batch testing or inspections of Digitek® . . . .

(Pls.' Memo. in Supp. at 40).

For the sake of argument, I am going to take the narrowest approach possible.  As the plaintiffs urge me to do, and merely for illustration purposes, I am going assume a class of New Jersey residents alone and apply only New Jersey law to their claims.  If predomination is not found at that narrowest of levels, it certainly would not emerge in a nationwide setting.  Looking first to the statutory consumer fraud claim, violation of the NJCFA is subject to proof of a number of elements.  A private plaintiff must show "(1) a violation of the . . . [NJCFA]; (2) that [he] suffered an *ascertainable loss* as a result of the unlawful conduct; and (3) *a causal relationship between the unlawful practice and the loss sustained by* . . . [him]." *Szczubelek v. Cendant Mortgage Corp.,* 215 F.R.D. 107, 121 (D.N.J. 2003) (emphasis added); (Pls.' Mem. in Supp. at 31 (conceding necessity

---

[11]The Second Amended Complaint in *Campbell*, for instance, contains additional proposed common issues.  I rely upon the more recent statement of common issues found in the plaintiffs' briefing of the class certification request.

of showing ascertainable loss)).  The second and third elements are very tough.  A similar case illustrates why.

In *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002), the plaintiffs said that the defendants failed to warn the FDA of material facts regarding Rezulin's safety.  They also said that they were injured by inadequate testing and warnings.  To get relief, they alleged that Rezulin was a defective product within the meaning of the NJCFA because it was unreasonably dangerous.  In denying certification, the district court said this:

> The New Jersey Consumer Fraud Act, upon which plaintiffs rely, for example, affords a right to monetary relief only if there has been an "ascertainable loss" in consequence of the "*consumer receiv[ing] something other than what he bargained for ... [and] los[ing] the benefits of the product which he was led to believe he had purchased.*" Plaintiffs' contention that everyone who took Rezulin sustained an ascertainable loss presumes that Rezulin *was worthless*. But that is not a defensible position. Even plaintiffs' experts acknowledge *that Rezulin was enormously beneficial to many patients*. Those patients presumably *got their money's worth and suffered no economic injury*. And the question whether an individual class member got his or her money's worth *is inherently individual*. Indeed, it involves very much the same questions as would a claim for money damages for personal injury.

*Id.* at 68-69 (S.D.N.Y. 2002) (emphasis added) (footnotes omitted).  Some of the same observations apply here to undermine predomination.  For instance, the representatives must concede that a number of their fellow class members used nearly all of their Digitek® supply just prior to the recall. After doing so, they experienced a physical benefit far outweighing any minimal economic loss associated with discarding the remaining dose or few doses they had left.  Some of the representatives testimony even suggests as much. Additionally, those class members who visited their doctors following the recall might have been experiencing generalized symptoms that would have prompted the visit anyway.  The highly individualized inquiry associated with separating the wheat from the chaff in just these two areas alone diminishes much of the hoped-for benefit from using the class device.

31

The second proposed common question, whether the recalled Digitek® was, and is, unsafe for use in humans, is fragmented and individualized as well. There was certainly plenty of recalled Digitek® that was perfectly suitable for human consumption. As the defendants note, "To date, not a single double thick tablet has been identified as having reached the market." (Defs.' Resp. at 6). The individual questions proliferate if the parties are ultimately required to determine which class members received defective Digitek® and which did not. In other words, it may ultimately be inappropriate to treat the recalled Digitek® as a single "defective" product for purposes of making the determination of whether it was unsafe. Once again, a supposedly "common" question becomes highly individualized.

The third proposed common issue is how Defendants "acted" in designing, developing, manufacturing, labeling, packaging, inspecting, dosing, supplying, distributing and selling the recalled Digitek®. That is really not an issue at all divorced from the particular claim being analyzed. Those "act[s]" may have nothing at all to do with imposing liability. They would be no more than counterfeit "common" questions in that setting.

There are a number of other highly individualized factual issues. These were exposed when the representatives or their predecessors were deposed. The first is product identification. The defendants assert that there is at least one representative who has testified that she is uncertain if the deceased whom she represents ever took Digitek®. That lingering factual issue appears to be cleared up by plaintiffs' reply brief. That is beside the point. Product identification will have individual, as opposed to collective, hallmarks. That same concern plays into whether the class is readily ascertainable.

32

Plaintiffs say that no class member could recover unless they first demonstrated they took Digitek®.  That much is true.  That proof though will be subject to individualized scrutiny by defendants as to each class member to assure entitlement to relief.  The supposedly collective issue of having taken Digitek®, then, only becomes so after a lot of individualized investigative work as to each class member.

Next is the existence and extent of the economic losses suffered by the class members.  Once again, one need look no further than the differences between the representatives or their predecessors.  Bobby Milligan returned Digitek® following the recall.  But he received in return replacement digoxin at no charge.[12]  Mr. Chambers wants a co-payment for a doctor visit that he had post-recall.  He admits though that the appointment was scheduled pre-recall.  If certification is granted, this type of fact-intensive investigation and explanation will likely be necessary for all claimants to assure that their claims compensation worthy.  That means that I, or a special master, would have to look at the purpose and timing of each doctor visit and perhaps apportion the co-payment depending upon the outcome.  That would require an unfathomable amount of resources.

Third is the vast array of individualized damages the representatives or their predecessors seek.  These include new glasses, toll charges, insurance premiums, and even the cost of two enemas.  The plaintiffs try to sweep this concern aside.  Our court of appeals will not: "To be sure, individualized damage determinations cut against class certification under Rule 23(b)(3)." *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Broussard v. Meineke Discount*

---

[12]Plaintiffs complain that Mr. Milligan's circumstances should not be considered since he never moved to be appointed as a class representative.  The concern is beside the point.  It is reasonable to assume that the circumstances testified to by Mr. Milligan are shared by other putative class members.

*Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir.1998)).[13]   These types of fact-intensive inquiries are invited by the extremely broad class definition offered by the representatives.  (*See* Pls.' Memo. in Supp. at 1-2 (seeking recovery for "economic losses, *including, but not limited to*, payments for Recalled Digitek®, *out-of-pocket expenses* for diagnostic testing, medical testing, medical visits and/or new prescriptions, as a result *of having received* Recalled Digitek®.") (emphasis added).

Fourth is the process of sorting out those potential class members who were already fully compensated by the Stericycle refund process.  The plaintiffs' again attempt to speedily brush aside these issues.  They say "the extent to which participation the Stericycle refund program may have ameliorated someone's losses is a damages question and does not render class certification inappropriate here."  (Pls.' Reply at 33-34 (emphasis added)).  Mitigation though is another highly individualized matter.  So too is the nature of the class members' damages generally.

Fifth is the nature and extent of third-party involvement in the process.  A number of class

_____

[13]Plaintiffs cite *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417 (4th Cir. 2003), a much earlier case, for the opposite proposition.   But *Gunnells* also observes as follows:

> Most recently, in *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 149 (4th Cir.2001), we held that where "[t]he functional equivalent of a full-blown trial on damages causation for each putative class member would be required to determine to which individuals [the defendant] is liable," the predominance requirement of Rule 23(b)(3) is not met. This was an application of the principle we elaborated in *Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir.1977), that pre-dominance may be destroyed when individualized issues regarding damages would require a large number of separate mini-trials. *See id.* at 69 ("[W]here the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created make (the) damage aspect of the case predominate, and render the case unmanageable as a class action") (quotation marks and internal citations omitted).

*Id.* at 460.

members no-doubt asked their druggists and doctors about the recall. The third-party guidance received will likely prompt the defendants to claim that the counseling was an independent cause of any economic damages suffered.

These many considerations lead me to find predomination is lacking. That is so even if I confine certification to multiple, single-state class actions using only the law of the particular state certified. A nationwide class, using the conflicting laws of the 50 states, would be entirely inappropriate as well.

## 2. Superiority

No lengthy discussion is necessary here. There is a big imbalance between common and individual issues. Complex conflict-of-law questions are involved. Typicality is largely absent. One more significant concern has been unmentioned to this point: "Rule 23(b)(3)(B) deems 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class' a pertinent consideration in deciding whether the class action is superior." *Gregory v. Finova Capital Corp.*, 442 F.3d 188, 190-91 (4th Cir. 2006) (citation omitted).

Both I and my distinguished state judicial colleagues have taken great care, with the assistance of the respective Steering Committees, to track this MDL and the state proceedings for a speedy, just and efficient resolution. *Daubert* and similar hearings are scheduled. Bellwether plaintiffs have been selected. Trial dates are set in the coming months. Adding a complex certified class to these already complicated state and federal proceedings makes little sense. It might derail the good case management efforts already undertaken. For instance, the plaintiffs place much emphasis on resolving common issues relating to defendants' fault. From a practical perspective, defendants' fault is being litigated aggressively already within this MDL. Duplication of effort costs money and wastes resources.

These considerations outweigh the benefits that might be gained from certification.  While it is true that some common, recurring questions might be resolved using the class device, there are many others that will not.  The individualized inquiries will inevitably swamp the common ones.  Any collective benefits achieved will result in much heavier losses in other quarters.  As a result superiority is lacking.

III.

I conclude that the movants have failed to carry their burden under Rule 23.  All that one can say with absolute certainty is that numerosity is present.  All of the other Rule 23(a) factors are either in play or unsatisfied.  Major choice-of-law problems loom on the horizon.  Real concerns appear when Rule 23(b)(3) is considered.  The common issues clearly do not predominate over the highly individualized ones.   If all this were not enough, a certification order at this critical time promises to derail the management efforts and resources devoted to more substantial issues in the case.  All of these considerations combine to demonstrate that the class proposed is not suitable for certification.  Accordingly, I **DENY** the motion for class certification.[14]

---

[14]I do so without prejudice to any future joint request to certify a settlement class for the MDL in its entirety.  As I discussed in *In re Serzone Products Liability Litigation*, 231 F.R.D. 221 (S.D. W. Va. 2005), certification of a settlement class avoids a lot of problems presented by this proposed class.  For example, the choice-of-law problem virtually disappears depending on the structure of the claim resolution process, if any.  Also, manageability concerns fall aside for obvious reasons.  Additionally, in the MDL-wide setting I might deem it more reasonable to emphasize the type of typicality analysis conducted in *Serzone*.  *See id.* at 238.

The court **DIRECTS** the Clerk to file a copy of this order in 2-08-md-1968 which shall apply to each member Digitek-related case previously transferred to, removed to, or filed in the is district, which includes counsel in all member cases up to and including civil action number 2-10-cv-00767. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint.  In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer.  It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court.   The orders may be accessed through the CM/ECF system or the court's website at www.wvsd.uscourts.gov.

ENTER: May 25, 2010

Joseph R. Goodwin, Chief Judge